IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

ELLIOTT GUNTHARP,                    )
                                     )
        Plaintiff,                   )
                                     )
VERSUS                               )  CIVIL ACTION NO: 1:05CV177-D-A
                                     )
ITAWAMBA COUNTY SHERIFF'S            )
DEPARTMENT and ITAWAMBA              )
COUNTY, MISSISSIPPI, SHERIFF         )
PHILLIP CRANE, in his                )
individual capacity, Jail            )
Administrator KENNETH KNIGHT,        )
in his individual capacity,          )
and PATRICK GRAHAM,                  )
                                     )
        Defendants.                  )

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Elliott Guntharp, who is bi-polar, was housed at the Itawamba County Jail for eight

days pursuant to a civil commitment procedure under conditions that were inhumane, and on some

occasions, constituted torture. While locked behind bars, Elliott was maliciously hit with a shock

baton[1] by jail administrator Kenneth Knight.

According to expert Phillip Goldsmith[2]:

In my opinion, Kenneth Knight was not trained in any manner in the use the shock

---

[1] During discovery, the baton was sometimes identified as a shock baton, sometimes as a stun baton, and sometimes referred to as a stun gun. All refer to the same item.

[2] Between 1987 and June 2002, Goldsmith was a Captain, then Director, of the North Mississippi Law Enforcement Training Center, and in 2002, was certified as an expert in the use of force in a trial before Judge Pepper styled, *United States v. Dillard and Stanford*. (Exhibit "1," Plaintiff's Expert Designation)

1

baton, and because of this, should not have taken it back to the holding cell. Further, because Elliott Guntharp was locked behind bars, and not a threat to anyone, it would have constituted the use of excessive force to use the shock baton on him under those circumstances, even if Elliott was disruptive or uncooperative. Finally, Kenneth Knight exhibited lack of training and supervision in allowing another inmate to handcuff Elliott.

(Plaintiff's Expert Designation)

Further, according to Goldsmith:

No law enforcement person should ever use lethal or non-lethal force without being properly trained on the equipment they are using, or trained in the proper techniques for using that piece of equipment. Knight testified that he found the shock baton in the jail, had no instruction manual to review, and received no training on the use of the shock baton before taking it back to the holding cells.[3] Knight further testified that he held the baton, with one hand on each end, and in fact, discharged the baton on himself.

Further, I concur with Sheriff Crane that under the undisputed fact that Elliott was locked behind bars, it would clearly be excessive use of force to shock Elliott with the shock baton under these circumstances.

(Goldsmith Expert Opinion)

Elliott's brother, Kent Guntharp, who spent eighteen years in law enforcement, testified as

follows:

Q. In your training in the use of lethal force, is it ever permissible from your experience and your training to hit somebody with a shock baton when they're locked up behind bars?

A. No.

Q. Never?

A. No. Never.

---

[3] Defendants admitted that, "Kenneth Knight and the Itawamba County jailers have not undergone training with respect to the use or maintenance of the baton at issue in this lawsuit. (Exhibit "3," Response to Fourth Interrogatories and Request for Production of Documents, Response to Interrogatory No. 1) Further, "The stun baton was left at the jail from the previous administration. . . No instruction manuals or other documentation related to the baton existed." (*Id*., Response to Request for Production of Documents, No. 1)

(Exhibit "2," Kent Guntharp depo., p. 106)

Sheriff Crane admitted that if Kenneth Knight hit Elliott with a stun baton while he was

locked behind bars and nobody's life was in danger, that it would be excessive force:

> Q. If . . . it happened as Elliott testified . . . wouldn't you agree . . . from your
> training as a highway patrolman for 28 years, that would be excessive force; is that
> correct?
>
> A. I don't think it's a fair question, but I'd say yes.[4]

(Exhibit "4," Sheriff Phillip Crane depo., pp. 6-10)

On March 28, 2005, Plaintiff timely filed his Notice of Claim as required by the Mississippi

Tort Claim Act ("MTCA"), Miss. Code Ann. § 11-46-1 et seq. [Docket 1, Attachment A]

On July 27, 2005, Plaintiff filed his Complaint in this Court against the Itawamba County

Sheriff's Department and Itawamba County, Mississippi, for violations of the First, Fourth and

Fourteenth Amendments fo the United States Constitution, and state law claim of negligence under

the MTCA. [Docket 1]

On March 27, 2006, this Court granted Plaintiff's motion to file his First Amended

Complaint, whereby the individual Defendants, Sheriff Phillip Crane, Jail Administrator Kenneth

Knight, and Jailer Patrick Graham were added as Defendants. [Docket 36]

In the Amended Complaint, Plaintiff alleged various causes of action against the municipal

and individual Defendants. [Docket 40]

Defendants have now filed their motion for summary judgment.[5]  Plaintiff will show that it

---

[4]  Not surprisingly, Knight testified that it would be justifiable to hit someone with a shock baton while the person was locked behind bars.  (Exhibit "5" "Kenneth Knight depo., pp. 77-78)

[5]  Defendant Patrick Graham, represented by separate counsel, filed a joinder to the other Defendants' motion for summary judgment, adopting the same arguments and authorities, relying on the same exhibits, and offering no additional arguments. [Docket 64]

is not well taken and should be denied.

## FACTS

Elliott Guntharp was born in 1960 and is the son of Travis and Phyllis Guntharp. (Exhibit "6," Elliott Guntharp depo., p. 5)   Elliott had two brothers, Kent Guntharp[6] and Greg Guntharp.[7] (*Id.*, pp. 6-7)   Kent's wife is Judy Guntharp. (Elliott Guntharp depo., p. 7)  Greg's wife is Sandra ("Sandy") Guntharp.  (*Id.*, p. 6)

At all times relevant to this lawsuit, Elliott lived with his mother, Phyllis, in Fulton, Mississippi.  (Elliott Guntharp depo., p. 7)

In 1979, Elliott joined the United States Army, becoming a wire systems installer.  (Elliott Guntharp depo., p. 12, 24) Elliott served his county as a soldier until 1985, one and half years of that service in Korea.  (*Id.*, p. 12)

In 1985, Elliott was diagnosed with bi-polar disorder.  (Elliott Guntharp depo., p. 13) Elliott was discharged from the army because of his medical condition.  (Exhibit "7," Phyllis Guntharp depo., p. 15)  In 1993, Elliott was deemed totally disabled because of his bi-polar condition.  (*Id.*, p. 16)

According to Elliott's brother Kent:

. . . whenever he gets in a stressful situation – and I know he has related some of

---

[6] Kent has been involved with law enforcement most of his adult life. (Kent Guntharp depo., p. 101)  Kent has an associated degree in police science and a bachelor of arts degree in law enforcement.  (*Id.*, p. 9) He attended numerous week, and multi-week long seminars during his eighteen-year law enforcement career.  (*Id.*, pp.  9, 14) Kent was a patrol officer for the Fulton (Mississippi) Police Department for approximately a year around 1975; the Marietta (Georgia) PD from 1976-1979; Cobb County (Georgia) PD 1980-85; Powder Springs (Georgia) PD 1988-93.  (*Id.*, p. 19)

[7] Greg passed away in 2003.  (Elliott Guntharp depo., p. 6; Kent Guntharp depo., p. 42) Just as with Kent, Greg spent his adult life involved in law enforcement, almost 30 years with the Lake County (Illinois) Sheriff's Department, ending as the deputy chief.  (Kent Guntharp depo., p. 102)

them to you such as trying to go to school, trying to have a job, being in a marital relationship . . . anytime he gets in an environment where he's under a lot of stress and pressure, typically that's when he struggles with those episodes or – as he and mother refer to it, when he gets sick. And so, the rest of the time . . . when those situations aren't present, he seems to do fine.

(Kent Guntharp depo., p. 34)

In 1991, because of his bipolar condition, Elliott had to be involuntarily committed. (Elliott Guntharp depo., p. 17) As a part of the commitment process, Elliott had to be locked up in the Itawamba County Jail for a number of days. (Phyllis Guntharp depo., p. 26) While at the jail, Phyllis was allowed to visit with Elliott in a little room at the front of the jail. (*Id.*, pp. 26-27) Elliott was not mistreated during his stay at the Itawamba County Jail in 1991. (*Id.*, p. 27)

In 1992, Elliott's father, Travis Guntharp passed away. (Elliott Guntharp depo., p. 19) After Travis passed away, Elliott continued living with his mother, Phyllis, who remained his primary care giver. (Elliott Guntharp depo., p. 12; Phyllis Guntharp depo., p. 32). Elliott's brother, Kent Guntharp, filled much of the void left by the passing of Travis by taking Elliott to the Veteran's Hospital in Jackson, Mississippi,[8] and to doctor's visits. (Elliott Guntharp depo., p. 20)

In March 2004, Elliott started having problems again with his bi-polar disorder.[9] (Elliott Guntharp depo., p. 22). While in the past he had saw things that were not there, at this time he was not having hallucinations, he "was just scared." (*Id.*, pp. 22-23). Elliott was arguing and generally uncooperative with his family members. (*Id.*, p. 25). Elliott's family was concerned and wanted him

---

[8] As part of his treatment for his bi-polar Elliott visits the Veteran's Affairs Hospital in Jackson, Mississippi, approximately every six months. (Elliott Guntharp depo., p. 21)

[9] According to Kent, ". . . what I see in his behavior is he gets extremely paranoid. He's very anxious. He worries a lot. He says a lot of irrational things. He's very moody. He's sensitive and somewhat argumentative and just real difficult to deal with. That's my perception of how he gets when he's getting sick." (Kent Guntharp depo., pp. 34-35)

to voluntarily check himself into the VA Hospital, but he refused.  (*Id*., p. 24)

On March 30, 2004, Phyllis filled out involuntary commitment papers at the chancery court so they could get Elliott the treatment he needed.  (Kent Guntharp depo., p. 59; Exhibit "8," Involuntary Commitment Papers; Exhibit "9," Appointment of Physician/Psychologist; Exhibit "10," Order for Mental Examination; Exhibit "11," Writ to Take Custody)  The plan was for Elliott to be picked up by the sheriff's department within hours of his appointment at Region III and then they could get him committed to the VA in Jackson.  (Kent Guntharp depo., pp. 60-61).  However, Elliott's condition worsened and things did not go as planned.  (*Id*., p. 62)

On April 1, 2004, Kent received a call from his mother that Elliott had locked her out of their house.  (Kent Guntharp depo., p. 47).  When Kent arrived, Phyllis was in the carport so they called the Fulton police and asked them to send someone out.  *Id.*  Officer Jerry Holder arrived and according to Kent:

> He and I were able to convince Elliott to let us in the house and . . . I pretty much let Officer Holder . . . do his thing and he did an excellent job, I felt, in calming Elliott down and getting him to cooperate . . .  Elliott's main concern was talking to his pastor and he was afraid.  He was very fearful of what would happen to him . . .but ultimately, Officer Holder was very adept at getting him to cooperate . . ..

(Kent Guntharp depo., p. 49)

According to Elliott, "I let [Officer Holder] into the house and he was really nice to me and he said he was going to take me to the jail house, so I went with him."  (Elliott Guntharp depo., p. 27).  Elliott believed they were going to get him some help.[10]  (*Id*., p. 29)

Once Elliott got to the jail, he told Officer Holder that he wanted to see his preacher, Brother

---

[10] No one ever told the Guntharp's that Elliott could be housed anywhere else other than the Itawamba County Jail.  (Kent Guntharp depo., p. 62)

Dewitt Bain.   (Elliott Guntharp depo., pp. 30-31.)  Officer Holder told Elliott, not at this time, and

he took Elliott's crosses and put them in a little bag.  (*Id.*, p. 30)

They put Elliott in the second cell in the holding area, "and while I was laying on the second

cell on the bottom, there were soiled sheets and blankets and this black guy come up there and he

said, what you doing in my cell?  And I was just laying there."[11]  (Elliott Guntharp depo., p. 32)

The first night in jail, Thursday, April 1, 2004, according to Elliott, "that night I was laying

in the bed, somebody started throwing water at me and I got really upset because I had my Bible

there and I was cussing at them because they were getting my Bible wet."  (Elliott Guntharp depo.,

p. 36)

The next day, April 2, 2004, Jail Administrator, Kenneth Knight and Patrick Graham came

to Elliott's cell to take him to Region III, Mental Health Facility for his evaluation as part of the civil

commitment process.  (Elliott Guntharp depo., pp. 36- 37)  According to Elliott:

> And he was going to cuff me and put some footcuffs on me, but I wouldn't do it and
> I started kicking at the cell.  He started cussing at me and then he got a shock baton
> and was sticking it in and out of between the bars at me. . . .  And he hit my wrist and
> Waterdog [Trustee Michael George] said that he'd cuff me and I let Waterdog cuff
> me . . .

(Elliott Guntharp depo., p. 37)

Kenneth Knight was cussing at Elliott and when Knight stuck the shock baton in on Elliott,

he tried to defend himself by kicking at the bar.[12]  (Elliott Guntharp depo., pp. 40-41, 48)  After

Knight hit Elliott with the shock baton on the right wrist, Elliott backed up to the back of the cell.

---

[11]  While staying at the jail, Elliott contracted crabs.  (Elliott Guntharp depo., pp. 60-61)

[12]  Elliott never received any treatment for the injury he sustained from the shock baton.  (Elliott Guntharp depo., pp. 83-84)

(*Id.*, pp. 41, 48)  Knight intentionally hit Elliott with the shock baton as he keep poking it into his cell.  (*Id.*, pp. 48, 80) During this time, the inmates where telling Knight that he was not supposed to do that.[13]  (*Id.*, p. 84)

Knight admitted that the shock baton sends out fifty thousand volts and "Yes, sir, it's painful."[14]  (Knight depo., p. 85)  Elliott still has a scar from where Knight maliciously hit him with the shock baton while he was locked up behind bars.  (Exhibit "12," Photograph of Elliott's hand)

According to inmate Joey Miller, Knight "stuck it in the bars,[15] and it was throwing flames, you know, like he was trying to poke him with it."  (Exhibit "13," Joey Wayne Miller depo., p. 10) Miller further testified:

Q.  But you observed with your own eyes Kenneth Knight sticking a night stick through the jail - -

A.  Through the bars.  And, you know, when you hit it, it shoots an electric spark that's . . . about two-foot long.  It shoots an electric spark, pop, pop, pop."

Q.  And you saw the electric spark shoot out from the baton?

A.  Nods head affirmatively

(Miller depo., p. 11)

Kenneth Knight and Patrick Graham had Trustee Michael George handcuff Elliott.  (Elliott Guntharp depo., p. 40)  Elliott was then taken to Region III for evaluation.  (*Id.*, p. 43)  On the way

---

[13]  Elliott was not the only person Knight tortured.  According to Joey Wayne Miller, who was incarcerated at the Itawamba County Jail at the same time, Knight "said we flooded the jail, so he handcuffed us all night long and left us handcuffed to the bars for 12 hours."  (Miller depo., p. 8)  Michael George confirmed that Miller was handcuffed to the bars of his cell for 12 hours.  (Exhibit "14," Michael Wayne George depo., p. 10)

[14]  Knight also admitted they had found the shock baton in the jail, had no training in its use, and in fact, had accidently shocked himself with it.  (Knight depo., p. 86-87) When Knight shocked himself, the electrical volt shot out about four inches from the baton and shocked him.  (*Id.*, p. 87)

[15]  Michael George also saw Knight stick the shock baton through the bars.  (George depo., p. 19)

8

to Region III, Knight threatened Elliott telling him, "if I don't act straight that he was going to hit me with the stick and throw me in a creek."  (*Id.*, p. 83)

According to Elliott, "Then we went to Region III and then at Region III, the doctors and stuff, I told them I wouldn't talk to them unless I seen my pastor."  (Elliott Guntharp depo., p. 37) At Region III, they still would not let Elliott see his pastor.  (*Id.*, p. 37; Exhibit "15," Certificate of Examining Physician/Psychologist)  While at the Itawamba County Jail, Elliott continually asked to see his preacher, Brother Bain, but was never allowed to see him.  (Elliott Guntharp depo., pp. 50-51)  That night, the other inmates kept throwing water on Elliott, so "I put a blanket over my cell where they couldn't get the water on me.  (Elliott Guntharp depo., p. 45)  Elliott was drenched with water from the other inmates every day he was at the jail and had to sleep in his wet clothes.[16]  (*Id.*, p. 53)  On one occasion, someone in the jail threw urine on Elliott.  (*Id.*, pp. 55, 77-78)

Joey Miller recalled Elliott hanging a sheet over the bars of his cell.  (Miller depo., p. 15) Concerning throwing water, Miller testified, "Well, that's something that they do in there when they get to arguing from cell to cell.  They throw water because you can't get to them, you know."  *Id.* According to Miller, it happens regularly there.  (*Id.*, p. 16) When asked whether they sometimes throw urine, he answered, "That's right, yeah."  *Id.*

Finally, Miller testified,

Q.  If the other people were annoyed in the cell, what would they do?  Throw water on them?

. . .

---

[16]  One of the deposition exhibits is Elliott's bible that he took in the jail with him which also got wet from the inmates repeatedly throwing water on him.  (Elliott Guntharp depo., pp. 82-83) Phyllis had given the Bible to Elliott and saw it was wet when she picked him up.  (Phyllis Guntharp depo., p. 75; Exhibit "16," Holy Bible, retained by Plaintiff)

A. Sure.

Q. Or urine?

A. I don't recall that, but yeah.

Q. But that's something they do in there - -

A. Yeah.

Q. - - when they can't get to somebody and they want them to shut up or - -

A. He was locked down all the time, you know.

Q. Did you ever see him let out of his cell?

A. No.

(Miller depo., pp. 17-18)

Sheriff Crane admitted that if the jailers let the inmates throw water on Elliott, that would constitute torture. (Crane depo., p. 66)

Each day after Elliott was taken to the jail, his mother tried to visit him. (Phyllis Guntharp depo., p. 53)

On Friday, April 2, 2004, Phyllis called the jail in the morning and was told that she could visit Elliott at 2 pm. (Phyllis Guntharp depo., p. 54) When she arrived at the jail at 2:00 pm, she was not allowed to see Elliott, and not given a reason why. (*Id*., p. 54)

On Saturday, April 3, 2004, Phyllis returned to the jail to see Elliott. (Phyllis Guntharp depo., p. 55) Again, she was told by Patrick Graham that she could not see him and was not told any reason why. *Id.*

On April 4, 2004, Kent, Judy, and Sandy went to the jail with Phyllis to try and visit Elliott, but were told that they would have to contact the jail administrator, Kenneth Knight, to arrange

10

visitation.  (Kent Guntharp depo., p. 79)  Kent had observed that inmates were visiting their relatives and friends in the fenced area in the back of the jail when they arrived and did not understand why they could not see Elliott.  (Kent Guntharp depo., p. 80)  According to Phyllis, ". . . as soon as I found out that I was not going to be allowed to see Elliott, I got very upset and turned to my daughter-in-law and we were hugging each other and we were . . . discussing how I felt about not being able to see him."  (Phyllis Guntharp depo., p.50)

Kent asked to speak to the Sheriff, and spoke to Sheriff Crane because they did not know how Elliott's condition was and were concerned about him.  (Kent Guntharp depo., p. 81)

Further, according to Kent:

> I told the sheriff that my sister-in-law, Sandy, had driven - - we called her and what was happening and she got in her car and drove down here from Illinois because he had been talking to her on the phone during this two-week escalation period that you referred to earlier and she was the only person who could get any information out of him or that he would talk to and frequently, when we would talk to him, he'd say, you know, I want to talk to Sandy.  I want to talk to Sandy. . . he kind of worships the ground she walks on.  And so, I wanted the sheriff to know that Sandy had come down.  She was there with us and perhaps if we could speak with him . . it might have a calming effect on him.  He might cooperate.

(Kent Guntharp depo., pp. 81-82)

Deliberately indifferent to Elliott's condition, all Sheriff Crane told Kent was that he had to clear it through Kenneth Knight.  (*Id*., p. 82)  Sheriff Crane testified that he could have arranged a special visitation for Elliott, but did not.  (Crane depo., p. 31)

On Monday, April 5, 2004, Phyllis and Sandy returned to the jail again right after 2:00 pm.  (Phyllis Guntharp depo., p. 57)  Again, they were not allowed to see Elliott.  (*Id*., p. 57)

On Tuesday, April 6, 2004, Phyllis and Sandy went to the jail around 2:00 pm to see Elliott.  (Phyllis Guntharp depo., p. 59)  They were again not allowed to see Elliott, nor told anyway they

11

could arrange to see him. *Id.* During the time Elliott was at the jail prior to going to Court, Elliott was never allowed to see his family. (Elliott Guntharp depo., pp. 51-52; Phyllis Guntharp depo., p. 80)

Knight admitted that he talked to Phyllis and Sandy but would let them see Elliott because it was not a visitation day, and because "if I let him out of jail to visit with his mother and something had happened between those two, then I feel like I'd be liable. (Knight depo., p. 34)

Notwithstanding, Defendant Patrick Graham testified under oath that he allowed Elliott to visit with his mother and another lady that Sunday "in the front room or lobby of the jail." (Exhibit "17," Patrick Graham depo., pp. 26-27) Incredibly, Defendant Graham also testified that he called Knight on Sunday, the 4th, and asked whether Elliott could visit his mother in the holding area after normal visitation time and Knight told Graham, "if you feel comfortable with it, I don't have a problem with it." (Graham depo., p. 45) Further, in the responses to Plaintiff's Requests for Admissions, Defendants claim that Phyllis was allowed to see Elliott during regular visitation hours. (Exhibit "18," Response to Request for Admissions, No. 6) Obviously, Defendant Knight and Defendant Graham both can not be telling the truth.

Knight's deliberate indifference to Elliott's welfare was even more egregious considering that he admitted he knew of no one having any problems with Elliott. (Knight depo., pp. 49-50) All of the jailers concurred. Carolyn Polege was one of jailers when Elliott was in jail. (Exhibit "19," Carolyn Polege depo., p. 5) Polege testified that she had no problems with him and he was never disruptive. *Id.* Jailer Carole Garrett also testified that she had no problems with Elliott. (Exhibit "20," Carole Garrett depo., p. 7) Jailer Tabatha Hallmark testified that, "I never had a problem with Mr. Elliott, never." (Exhibit "21," Tabatha Hallmark depo., p. 26)

12

On Wednesday, April 7, 2006, after a week of trying to visit him every day, Phyllis finally saw Elliott when he was brought to Court, "He looked so bad. He was in shackles on his feet and hands both." (Phyllis Guntharp depo., p. 59)

As Kent Guntharp testified:

In so much as we had repeatedly asked - - Sandy Guntharp, my sister-in-law, I believe is the one . . . that ultimately got this thing resolved because we had said through the entire process to anyone that would listen to us that if they would let Sandy talk to Elliott, he would sign whatever papers to do whatever necessary to get him down to Jackson as quickly as possible. Now, my understanding is when we came to court we approached Michelle Floyd and we said, Ms. Floyd, you know, we have tried and tried and tried to get Elliott a few minutes with Sandy because we know that not only she has a calming effect on him, perhaps she can get him to cooperate and sign whatever is necessary so we can get him to Jackson. And it's my understanding at that point in time she asked the judge if we could do that. They went into a room at the back of the court, spent a few minutes and when Michelle Floyd came out, she said, I think we got this resolved. I think we can get Elliott to Jackson now.

(Kent Guntharp depo., p. 69)

Finally, after eight days of inhumane treatment, including torture, Elliott waived the hearing, signed the commitment papers, and Judge Mask signed the Oder, then Amended Order, having Elliott committed to the VA Hospital in Jackson, Mississippi. (Exhibit "22," Waiver of Hearing; Exhibit "23," Order of Commitment; Exhibit "24," Amended Order of Commitment) Elliott was released to his mother for her to transport Elliott to the VA Hospital. (Exhibit "25," Agreement and Release) After on a few minutes with Sandy, Elliott waived the commitment hearing and voluntarily committed himself to the VA hospital. If Sheriff Crane or Kenneth Knight had only let Elliott's family see him earlier, Elliott would not have had to spend four additional days in jail, without treatment.

13

According to Sandy:

I talked with Elliott's attorney, Michelle Floyd, and she said that if Elliott would sign a waiver, he could avoid going before the Judge to have a hearing regarding his mental health. She allowed me to see him and within 5 minutes he signed the wavier and do whatever his family wanted. This was the first time I had seen Elliott since I had arrived in Fulton 5 days before.

(Exhibit "26," Sandy Guntharp Statement)

Phyllis had brought Elliott some toiletry items and clothes to give to Elliott. (Kent Guntharp depo., p. 83) They gave these items to Patrick Graham (the tall husky jailer, and the only male jailer working there) along with around $40.00 cash so Elliott could buy some candy bars and Cokes. (Kent Guntharp depo., p. 83; Graham depo., p. 33) Elliott never received the money, clothes, or hygiene products his family sent him. (Elliott Guntharp depo., p. 84) Graham could not deny that they gave Elliott the items his family brought for him. (Graham depo., p. 34) When Elliott was released from jail, Phyllis received no return property whatsoever other than his boots. (Kent Guntharp depo., p. 95)

Sheriff Crane admitted that he had no special training for dealing with the mentally ill. (Crane depo., p. 11) Sheriff Crane also admitted that he provided no training for his staff for dealing with the mentally ill. (Crane depo., p. 21) Kenneth Knight testified that the jail had no special procedures for dealing with the mentally ill. (Knight depo., p. 55) Jailer Patrick Graham testified that he received no specific training for handling the mentally ill. (Graham depo., p. 9) When Jailer Carol Polege was asked what training she had for dealing with the mentally ill , she replied, "None." (Polege depo., p. 12) Similarly, Carole Garrett testified that she received no training at the Itawamba County Jail in how to handle the mentally ill. (Garrett depo., p. 6) Jailer Tabatha Hallmark testified that she received no training for dealing with mentally ill persons from Sheriff Crane or Kenneth

14

Knight, and that there is no special accommodations for mentally ill people staying at the jail. (Hallmark depo., pp. 28-29)

Sheriff Crane testified that: "The operation of the jail is basically left to Kenneth Knight. He's the jail administrator. That's what I've got him hired for and I let him run the jail." (Crane depo., p. 24) In effect, Crane testified that Knight is the policy maker for the jail and as such, his actions carry the same force as that of the Sheriff, being the municipalities official policies and customs. Sheriff Crane testified that he left visitation up to Kenneth Knight. (Crane depo., p. 29) However, Kenneth Knight testified that he has no special training or certification to be a jail administrator. (Knight depo., pp. 7-8) Again, the complete failure to train by Defendants.

During the eight days that Elliott was in the jail, he only received his medications 2 times before he was taken to Court.[17] (Elliott Guntharp depo., pp. 39, 49) Elliott's medications were never returned to his family. (Phyllis Guntharp depo., p. 79) Further, the jail gave Phyllis a bag that was supposed to be Elliott's stuff when she picked him up, but it was not, it belonged to someone else. (*Id.*, pp. 79-80)

Elliott had to wear the same dirty clothes the entire week he was in the jail and did not get a shower until the night before he went to Court, even though Elliott requested a shower to Patrick Graham every other day. (Elliott Guntharp depo., pp. 45-46, 56) The daily activity logs confirm that Elliott did not get a shower until April 6, 2004, the night before he went to Court, after spending six nights in the jail wearing dirty, wet, urine soaked clothes up until that until that time. (Exhibit "27," Daily Activity Logs)

---

[17] Joey Miller, who was incarcerated at the Itawamba County Jail in April of 2004, testified that he did get his medication every day. (Miller depo., p. 13)

15

According to Knight, they try to allow one hour per day outside their cell for persons in the jail to walk around. (Knight depo., p. 46) However, they have no policy and as with most things, he leaves this up to his jailers discretion. (Knight depo., p. 46) In the eight days Elliott was there, he was only allowed out of his cell to walk around on one occasion. (Elliott Guntharp depo., p. 81)

On April 7, 2004, Elliott was finally taken to Court, then returned to the jail to spend one more night. (Elliott Guntharp depo., p. 59) The next day, Elliott's mother and his sister-in-law, Sandra Guntharp, picked him up and took him home. (Elliott Guntharp depo., p. 60) When they picked him up, Elliott "had someone else's underwear on and somebody else's T-shirt." (Phyllis Guntharp depo., p. 68) According to Elliott, "I was so traumatized that they had to take off my clothes and give me a bath and head me over to the VA in Jackson." (Elliott Guntharp depo., p. 60)

According to Phyllis,

He was just crying and going on and he fell on the floor and laid on the floor crying . . . he was complaining he was dirty and needed a bath and I could tell that he needed a bath . . . He was itching on the bottom and his hand was also itching. I had to undress him because he seemed incapable of undressing himself . . ..

(Phyllis Guntharp depo., p. 76)

Further, according to Phyllis, on the trip to the VA in Jackson:

He talked almost nonstop. All he did was complain about his stay at the jail and that for us to never do that again; that he would sign himself in and that he'd rather be dead than spend another week like that. He said it was hell. It was torture. And he just kept repeating all this stuff all the way to Jackson. And me and Sandy just could not calm him . . . He was just so traumatized by it all.

(Phyllis Guntharp depo., pp. 76-77)

Elliott was so traumatized by his treatment at the jail he had to stay at the VA hospital for approximately six weeks. (Elliott Guntharp depo., p. 66) The doctors had to put him on stronger

medication.  (*Id*., p. 66)  According to Kent,  "He was so traumatized, they could not do anything . . .  They sedated him to unconsciousness and had him in a padded cell for almost a week before they could even begin to try to help him."  (Kent Guntharp depo., p. 103)

During Kent's deposition, the following exchange occurred:

Q.  So could you ever see yourself suing a police department or sheriff's department?

A.  Absolutely not.

Q.  So why are you doing it now?

A.  I think my brother was done a tremendous injustice. . . he was not a criminal but he was subjected to an environment that probably was not even appropriate for . . . criminals.  He certainly was not given any special level of care.  I think he was abused.  I think he was tortured and I think it caused him to get sick in a way – in this episode.  I do not believe he is the same nor will he ever be the same again, whereas, each time he got sick before and they treated him and he came back, straightened his medication out, he was right back to the way he was and he hasn't been that way since.

(Kent Guntharp depo., pp. 102-03)

For months later, Elliott repeatedly told his mother of the horror of his stay at the Itawamba County Jail, "I don't want it to happen again to me.  That's the worst nightmare I ever had in my whole life."  (Elliott Guntharp depo., p. 65)  Phyllis wrote down what Elliott told her about his treatment at the jail, "that he had repeated over and over to me I don't know how many times."  (Phyllis Guntharp depo., p. 70; Exhibit "28," Statement Written by Phyllis Guntharp)

According to Roger McMurtry, bureau chief for mental health services at the State Department of Mental Health, "We still unfortunately have people with mental illness housed in jails waiting for hospital beds.  It's just unconscionable to me.  It's like if you had cancer, and they say we're going to send you to jail."  (Exhibit "29," Clarion Ledger Newspaper Article)

17

What is even more unconscionable is to treat the mentally ill, like Elliott, whose only crime was that he was sick, inhumanely and even torture them.

## STANDARD OF REVIEW

"[S]ummary judgment is an extreme and drastic measure which courts should use sparingly and only in the clearest of cases." *Printy v. Crochet & Borel Services*, 196 F.R.D. 46, 50 (E.D. Tex. 2000). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the non-movant's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980). See also, *Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989); *Runnells v. Armstrong World Industries, Inc.*, 105 F.Supp.2d 914, 918 (C.D. IL 2000).

In ruling on a motion for summary judgment, the Court is not to make credibility determinations, weigh evidence, draw inferences from the facts, or draw from the facts, legitimate inferences for the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255.

"Trial courts must be particularly cautious about granting summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Peralta v.*

18

*Cendant Corp.*, 123 F.Supp.2d 65, 75 (D. Conn. 2000) (*citing Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 87 (2d Cir. 1996)). Where the facts are such that two inferences may be drawn, a factual issue for the jury is presented. *Hunt v. Cromartie*, 526 U.S. 541 (1999). "At the summary judgment stage, the nonmovant need only point to the existence of a genuine issue of material fact." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

Finally, "a motion for summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Gibson v. Henderson*, 129 F.Supp.2d 890 (M.D. N.C. 2001).

Defendants cannot meet that test and summary judgment would be improper.

## ARGUMENTS AND AUTHORITIES

### I. CONSTITUTIONAL CLAIMS

It is a well entrenched constitutional principle that:

when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See *Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("When a person is institutionalized-and wholly dependent on the State[,] ··· a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- *e.g.,* food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble, supra,* 429 U.S., at 103-104, 97 S.Ct., at 290-291; *Youngberg v. Romeo, supra,* 457 U.S., at 315-316, 102 S.Ct., at 2457-2458. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See *Estelle v. Gamble, supra,* 429 U.S., at 103, 97 S.Ct., at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be

met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199-200 (1989).

Further,

In the past, this Court has noted that the right to personal security constitutes a "historic liberty interest" protected substantively by the Due Process Clause. *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). And that right is not extinguished by lawful confinement, even for penal purposes. See *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.

*Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982)

At least one federal court of appeals has found confining mentally ill persons, pursuant to civil commitment proceeding in jail unconstitutional:

Plaintiff-appellants do not seek freedom from restraint but rather conditions of restraint which do not exacerbate their mental condition. Since emergency detention is justified only until a probable cause determination can be made, those awaiting commitment proceedings are entitled to confinement which is not inconsistent with being released or committed. Jail is a place of incarceration for those accused of crimes. If pretrial detainees cannot be punished because they have not yet been convicted, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 20 L.Ed.2d 447 (1979), then emergency detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment. Temporary jail detention of those awaiting civil commitment proceedings as is currently practiced in Alabama violates substantive due process.

*Lynch v. Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984).

The Court held: "We forbid the use of jails for the purpose of detaining persons awaiting involuntary civil commitment proceedings, finding that to do so violates those persons' substantive

and procedural due process rights." *Id.*, at 1463.

However, according to the Fifth Circuit:

Government-imposed detainment pending an admission hearing, like involuntary commitment itself, is a "massive curtailment of individual liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). On the other hand, the government has a "compelling interest in the emergency detention of those who threaten 'immediate and serious violence to themselves or others,' " and must be permitted to detain such persons, provided the nature and duration of detention comports with constitutional parameters. *Lynch v. Baxley,* 744 F.2d 1452, 1458 (11th Cir. 1984) (quoting *Lynch v. Baxley,* 386 F.Supp. 378, 387 (M.D.Ala. 1974)).

*Boston v. Lafayette County, Miss.*, 743 F.Supp. 462, 468 (N.D.Miss.1990)

Further,

The court is cognizant of no reason why a county may not, in the interest of societal safety, temporarily detain in jail an individual who, despite prescribed psychotropic medication, has exhibited violent tendencies towards herself and her own infant. **If substantive due process is deprived, be it jail or mental health facility, the deprivation is caused by a failure to provide constitutionally adequate food, clothing, shelter, medical care and other safe conditions of confinement**--not by any official title placed over the front entrance.

*Id.*, p. 469 (emphasis added).

According to the Fifth Circuit:

The constitutional rights possessed by an involuntarily committed mentally retarded person include, in addition to "adequate food, shelter, clothing and medical care," the liberty interest in reasonably safe conditions and freedom from undue bodily restraints, and "such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2458-59, 2461-62, 73 L.Ed.2d 28 (1982).

*Feagley v. Waddill*, 868 F.2d 1437, 1439 (5th Cir. 1989)

Defendants claim, and Plaintiff agrees, that his constitutional claims must be brought under

42 U.S.C. § 1983. Defendants further cite *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996),

21

and *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997), for the proposition that these types of cases are typically divided into two categories, "conditions of confinement," and "episodic acts or omissions." While it is true that some of Plaintiff's claims are episodic acts or omissions, others are more properly classified as "conditions of confinement."

### A.    Free Exercise of Religion and Free Association

Plaintiff withdraws his free exercise of religion claim at this time.

However, Plaintiff's right to visit his family should survive summary judgment.  Elliott was in jail pursuant to a civil commitment process.  Defendants continually assert that Elliott was there because of a domestic violence charge, which is nothing more than a red herring. The Amended Order of Commitment states, "the Respondent is in the Itawamba County jail awaiting an available bed at the state mental health facility."  (Amended Order of Commitment)  While it is true that he was picked up and taken to the jail based on his actions resulting from his bi-polar condition, on March 30, 2004, it was only after the civil commitment papers were signed by his mother.  If he was at the jail based on criminal charges, he could have bonded out, which is not the case here.  Elliott remained in the Itawamba County Jail for 8 days, as part of an involuntary civil commitment procedure.

Other persons in the jail were allowed to visit with their families, Elliott was not afforded the same consideration.  This violated Elliott's constitutional rights, including his equal protection right. Kent Guntharp specifically asked Sheriff Crane for his family to be allowed to see Elliott, on visitation day.  Kent explained that Sandy Guntharp was the person in the family who could have got Elliott to sign the papers to be voluntarily committed.  Crane's and Knight's refusal to allow his family to visit him was subjectively indifferent to Elliott's needs.  Sandy Guntharp, Elliott's sister-in-

law, drove all the way from Illinois, to see Elliott. Because Sheriff Crane and Kenneth Knight would not let his family see Elliott, Elliott had to stay in the jail, under the inhumane conditions that existed, for at least four additional days.

Sheriff Crane testified that he could have arranged a special visitation for Elliott, but did not. Crane told Kent Guntharp that they would have to clear it with Kenneth Knight. Sheriff Crane testified that: "The operation of the jail is basically left to Kenneth Knight. He's the jail administrator. That's what I've got him hired for and I let him run the jail." Thus, the actions of Kenneth Knight in running the jail are the "customs and policies" of the Sheriff and have the same legal effect.

### B.    Fourteenth Amendment - Dispensing of Medicine

### C.    Treatment for Mental Illness; Items Brought by Family

Plaintiff contents that his claims concerning dispensing of medicine, treatment for mental illness and failure to provide items, including toiletries and clean clothing, are part of the larger constitutional violation of failure to provide "clothing, shelter, medical care, and reasonable safety" which were his "conditions of confinement" while staying at the jail pursuant to a civil commitment procedure and will be discussed more fully in other sections.

### D.    Failure to Train

Defendant characterizes this claim as a failure to provide for his basic human needs. It is more. It is a failure to train to provide for Elliott's basic human needs.

According to the Fifth Circuit, Defendants can be held liable if:

(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate

indifference. *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir.1986). For an official to act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

*Smith v. Brenoettsy*, 158 F.3d 908, 911 -912 (5th Cir. 1998)

As discussed previous, Sheriff Crane admitted that he had no special training for dealing with the mentally ill. Sheriff Crane also admitted that he provided no training for his staff for dealing with the mentally ill. Kenneth Knight testified that the jail had no special procedures for dealing with the mentally ill. Jailer Patrick Graham testified that he received no specific training for handling the mentally ill. When Jailer Carol Polege was asked what training she had for dealing with the mentally ill , she replied, "None." Similarly, Carole Garrett testified that she received no training at the Itawamba County Jail in how to handle the mentally ill. Jailer Tabatha Hallmark admitted that she received no training for dealing with mentally ill persons from Sheriff Crane or Kenneth Knight, and that there is no special accommodations for mentally ill people staying at the jail.

As also discussed, because of this lack of training in dealing with the mentally ill, Plaintiff was inhumanely treated: (1) including water and urine being thrown on him, not given a bath for six days and having to wear the same wet urine soaked clothes; (2) not being given his medications regularly, even though he was suffering severely from his bi-polar condition; (3) not being allowed to see his family members, even though Sandy could have got him to voluntarily commit himself for treatment, ending his nightmare; (4) providing him dirty linen which resulted in him getting crabs while he was incarcerated; (5) only allowing him out of his cell on one occasion to walk around in more than a week; and finally, (6) allowing the Jail Administrator to use excessive force on Elliott

24

by hitting him with a stun baton while he was locked behind bars, which he had no training to use.

> When a person is institutionalized-and wholly dependent on the State[,] ⋯ a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- *e.g.,* food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney, supra, at* 199-200.

While it is true that the state has a duty to provide for the basic needs of the mentally ill and convicted inmates, the basic needs of the mentally differ greatly. The needs of a mentally ill person receiving medications and being provided reasonable safety are different than those that are not so afflicted. Defendants provided no training whatsoever to provide for these basic needs.

Further, according the Fifth Circuit, confinement that deprives someone of cleanliness, sleep, and peace of mind, including housing in filthy, unsanitary cells, depending on the facts, might violate the Eighth Amendment. *Harper v. Showers,* 174 F.3d 716, 720 (C.A.5 (5th Cir. 1999) "In addition, sleep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment." *Id.*

In deliberately failing to provide any training, whatsoever, for dealing with the mentally ill, knowing that in Mississippi, it still adheres to the medieval idea of locking up the mentally ill, Defendants were deliberately indifferent to the basic human needs of the Plaintiff for reasonable safety and cleanliness. Instead, Elliott was subjected to inhumane conditions of confinement, that at times, constituted torture. Sheriff Crane admitted that if prisoners were allowed to throw water on him, it would constitute torture.

Finally, it is undisputed that Kenneth Knight had no training whatsoever in the use of the

shock baton.  As Phillip Goldsmith stated,"Kenneth Knight was not trained in any manner in the use the shock baton, and because of this, should not have taken it back to the holding cell."

At the least, Plaintiff has created a jury question as to whether Defendants provided adequate training to deal with the mentally ill, such as Elliott, staying at the Itawamba County Jail, and adequate training for use of non-lethal force, and summary judgment would be improper.

### E. Segregation

Elliott was not segregated from the general criminal population.  Instead, the inmates in the holding area were allowed to throw water and urine on him.

While Defendants are correct that, "absent exigent circumstances," custodial classifications cannot be the basis of constitutional violations, failure to provide a reasonably safety can be such. Elliott was locked in a cell where others were allowed to throw water and urine on him, constituting torture.  Sheriff Crane admitted that would constitute torture.

At the least, Plaintiff has created a jury question as to whether Defendants provided reasonably safe place for Elliott, and summary judgment would be improper.

### F. Punishment

While staying at the Itawamba County Jail, Elliott was punished by Kenneth Knight by being hit with a shock baton.  Crane, the official policy maker for the County testified that Knight runs the jail.  Thus, Knight is an official policy maker and his actions are the actions of Itawamba County. Elliott was in the jail only because there was no bed to house him at a mental health facility.  He was not staying there because he committed a crime.  Punishing a person who has committed no crime is unconstitutional.

At the least, Plaintiff has created a jury question whether Elliott was unconstitutionally

26

punished.

> **G.** **Affidavit of Poverty**

Plaintiff withdraws this individual constitutional claim at this time.

> **H.** **Use of Shock Baton**

Kenneth Knight used excessive force by hitting Elliott with the shock baton while he was locked behind bars.

Defendants rely on *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992), for its argument that the use of the shock baton on Elliott was reasonable. Defendants reliance of *Caldwell* is misplaced. In *Caldwell*, the officers **entered the cell** before using the stun gun. *Id.*, p. 597. As the Court said, "Under *Russo,* the use of a taser is permissible when resort to even greater force may be necessary. *Russo,* 953 F.2d at 1045. In this case, it was not unreasonable for the police officers to conclude that the use of the stun gun was necessary to avoid using even greater force against Caldwell." *Id.* Are Defendants contending that use of the shock baton was necessary so they would not have to shoot Elliott?

Similarly, in *Dye v. Lomen,* 40 Fed.Appx. 993, 996, 2002 WL 1585903, **2 (7th Cir. 2002), the officers "used a stun gun against him **during the two cell entries**."

Finally, Defendants cite *Camp v. Brennan*, 54 Fed.Appx. 78, 79-80, 2002 WL 31723093,**1 (3rd Cir. 2002). However, once again, the use of non-lethal force was not applied to a person safely locked behind bars:

> On October 6, 1996, a team of five to six guards **forcibly extracted Camp from his cell**, where he had been exhibiting erratic and threatening behavior. Camp was handcuffed and led by the guards toward an observation cell. As they were proceeding down a hallway and through an exit, Camp placed his foot against the door and pushed off. His doing so caused the group to stumble off balance, and

27

> Camp either fell or was pushed to the floor. While Camp was on the ground, one of the officers applied an EBID (Electronic Barring Immobilization Device), or stun gun, to Camp at least once.

*Id.*, at 79-80.

Elliott was not a convicted criminal, he was a mentally ill person housed in the jail pursuant to a civil commitment process. Elliott was locked behind bars and not a threat to anyone. To use this type of force on a mentally ill person, when it is not necessary, is unconscionable.

Defendants argue that "If it does not violate the constitution to enter a cell and apply a stun gun to an inmate just because the inmate refuses to put on handcuffs, *a fortiori*, is should not violate the constitution to show the inmate a stun baton through the bars of his cell because he similarly refuses to put on handcuffs." However, after scouring the legal databases of all other districts through Westlaw, Defendants provide no legal support for this extrapolation. With all the cases out there, Defendants were apparently unable to find one case that says hitting a person locked behind bars, and of no danger to anyone, with a shock baton is acceptable. The reason is simple, it is not acceptable and is instead clearly excessive force.

Further, with all due respect, Defendant misses the point. The fact that Kenneth Knight even took a shock baton back to Elliott's cell indicates malicious intent on his part. Further, Kenneth Knight maliciously stuck the shock baton through the bars of the cell and hit Elliott with an electrical shock. What makes this case so egregious is that Knight did so while Elliott was safely behind bars and posing no threat to anyone. It is undisputed that Knight did not enter the cell before using the electrical device.

According to expert Phillip Goldsmith,[18] "because Elliott Guntharp was locked behind bars, and not a threat to anyone, it would have constituted the use of excessive force to use the shock baton on him under those circumstances, even if Elliott was disruptive or uncooperative."

Elliott's brother, Kent Guntharp, who spent eighteen years in law enforcement, testified that it was never permissible to hit somebody with a shock baton when they're locked up behind bars.

Finally, Sheriff Crane admitted that if Kenneth Knight hit Elliott with a stun baton while he was locked behind bars and nobody's life was in danger, that it would be excessive force.

Sheriff Crane testified that "The operation of the jail is basically left to Kenneth Knight. He's the jail administrator. That's what I've got him hired for and I let him run the jail." Thus, the actions of Knight are the customs and policies of the Sheriff's Department and Itawamba County. Therefore, municipal liability may be imposed on the Defendants for Knight's use of excessive force, as well as liability on Kenneth Knight.

At the least, Plaintiff has created a jury issue as to whether Knight used excessive force against Elliott and summary judgment would be improper.

## I. Qualified Immunity - Crane and Knight

Defendants argue that, "[b]ecause Plaintiff has not established a prima facie case of constitutional liability against Itawamba County through the actions of Crane or Knight, this Court should not have to reach the issue of qualified immunity." Defendants then argue, "in those claims in which Plaintiff might have alleged the violation of clearly established constitutional right, the undisputed facts show that Crane and Knight acted with objective reasonableness under well settled

---

[18] Of note, Defendants failed to designate an expert to contradict Goldsmith's expert opinion that this was clearly excessive force. Instead, they designated a expert to testify that he conducted tests with the baton at issue on hotdogs.

29

law in the circumstances in which they were confronted." Finally, "because reasonable public officials can differ on the lawfulness of Crane and Knight's actions, they are entitled to qualified immunity."

Other than the conclusory statement that they are entitled to qualified immunity, Defendants have failed to inform the court specifically why they are so entitled. Regardless, Plaintiff will attempt to respond to Defendants phantom argument as best he can.

> "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *See Mendenhall v. Riser,* 213 F.3d 226, 230 (5th Cir.2000). This doctrine of "qualified immunity" reconciles the need to compensate individuals whose rights have been violated with the concern that personal liability will inhibit public officials in the discharge of their duties. *See Johnston v. City of Houston,* 14 F.3d 1056, 1059 (5th Cir.1994). According to the Fifth Circuit,
> Qualified immunity protects against novel theories of statutory or Constitutional injury--any purported harm must stem from rights clearly established under law at the time of the incident, and the contours of that right must be sufficiently clear such that a reasonable officer would understand that his actions were violative of the rights at issue. *See [Anderson v. Creighton,* 483 U.S. 635, 638-39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).] Thus, the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." [*Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).]
> *Mendenhall,* 213 F.3d at 230. "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Johnston,* 14 F.3d at 1059 (citing *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990), *abrogated on other grounds by Martin v. Thomas,* 973 F.2d 449 (5th Cir.1992)).
> Application of the qualified immunity defense requires a two-step analysis. *See Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992). First, the court must determine whether the plaintiff has alleged facts indicating the violation of a constitutional right clearly established at the time of the violation. *Id.* at 305. A right is "clearly established" when its contours are clear enough for a reasonable official to understand that what he is doing violates that right. *Id.* at 310 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). If the plaintiff satisfies this standard, the court must evaluate whether the defendant's

conduct was objectively reasonable. *See Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993); *Salas,* 980 F.2d at 305-06.

*Phillips v. City of Victoria,* 2006 WL 840402, *7 (S.D.Tex. 2006)

In this case, it is undisputed that each of Plaintiff's claims implicate a constitutional right clearly established as of April 2004: (1) First Amendment; (2) training and supervision; (3) providing for basic needs, including medications, sanitation and providing a reasonably safe environment; and (4) prohibition of punishment and use of excessive force. The only issue is whether Crane's and Knight's actions were "objectively reasonable."

As discussed more fully in previous sections:

(1) It was not objectively reasonable for Crane and Knight to deny visitation for Elliott's family. If they would allowed such visitation, Sandy would have been able to get Elliott to sign the voluntary commitment papers and Elliott would not have had to spend an additional four days in the jail, under inhumane conditions. Crane and Knight were deliberately indifferent to the needs of a mentally ill person who was only in the jail because he was sick.

(2) It was not objectively reasonable for Crane and Knight to provide no training for staff to deal with the basic needs of mentally ill persons staying at the jail, knowing that it would have to house these individuals under Mississippi's medieval system for dealing with the mentally ill. It was not objectively reasonable for Knight to use non-lethal force with a device in which he had received no training.

(3) It was not objectively reasonable for Crane and Knight to fail to provide for the basic needs of a mentally ill person staying at the jail, in failing to properly dispense his medications, putting him in a dirty cell with dirty sheets so that he caught crabs, only allowing him out of his cell

31

one time for exercise, nor providing a change of clothes or a shower for six days.

(4) It was not objectively reasonable for Crane and Knight to fail to provide a reasonably safe environment for Elliott, allowing convicts to throw water and urine on him, so he could not rest or sleep, which Sheriff Crane admitted was torture. Nor was it objectively reasonable for Crane to allow Knight to use excessive force on a person locked behind bars. Crane testified that Knight ran the jail, so in effect, Knight was the policy maker for the jail. Crane admitted that hitting Elliott when he was behind bars was excessive force.

In sum, there is a jury issue whether Crane's and Knight's action were objectively reasonable and summary judgment on the issue of qualified immunity is unwarranted.

## II.     STATE LAW CLAIMS

### A.  Mississippi Tort Claims Act

Defendants claim that the MTCA provides immunity for negligent acts of Itawamba County, Crane and Knight because Elliott was "lawfully incarcerated in a penal facility." The MTCA specifically provides that a governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

> Of any claimant who at the time arises is an **inmate** of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse penal farm, penitentiary or such institution when the claim is filed.

Miss. Code Ann. § 11-46-9(m).

While this is true, Plaintiff was not an "inmate," but instead a patient, and was merely being housed there because there was no other place to put him.

32

As Judge Biggers stated:

Names or labels carry no inherent weight in due process analysis, and the mere labeling of a detainment facility as a "jail" instead of a "mental health facility" does not, without something more, shift the balance of interests in the direction of finding a constitutional violation. Indeed, the use of artificial labels to sidestep weighing conflicting interests directly conflicts with Supreme Court precedent analyzing the Due Process Clause.

*Boston, supra*, at 468.

Thus, the Itawamba County Jail was a defacto mental health facility in which Elliott was being housed.

According to Miss. Code Ann. 41-21-67.

**Proceedings upon affidavit; physician or psychologist authority for temporary commitment**

(4) If the chancellor determines that there is probable cause to believe that the respondent is mentally ill and that there is no reasonable alternative to detention, the chancellor may order that the respondent be retained as an emergency patient at any available regional mental health facility or any other available suitable location as the court may so designate pending an admission hearing and may, if necessary, order a peace officer or other person to transport the respondent to such mental health facility or suitable location. Any respondent so retained may be given such treatment by a licensed physician as is indicated by standard medical practice. However, the respondent shall not be held in a hospital operated directly by the Department of Mental Health; and **shall not be held in jail unless the court finds that there is no reasonable alternative.**

Miss. Code Ann. § 41-21-67 (4).

As the Mississippi Supreme Court has stated, in the context of equal protection: "The legislature had a legitimate purpose in protecting governmental entities from claims brought by inmates, thus there is not equal protection violation in denying prison inmates certain rights granted to law-abiding citizens." *Carter v. MDOC*, 860 So.2d 1187, 1194-95 (Miss. 2003). Elliott was a law-abiding citizen who was merely sick, and there is no logical reason that he should be treated like

33

a common criminal.

Plaintiff has a good faith belief that if this issue was brought before the Mississippi Supreme Court, which Plaintiff believes it has not been, it would classify Elliott a patient at a mental health facility and not an inmate at a jail. Plaintiff asks this Court to interpret this statute the only reasonable way and declare that the immunity provided by Miss. Code Ann. § 11-46-9(m), are not intended for the facts presented before this Court, a person being housed in a jail only because there is no bed in a mental health facility.

### B. Conversion

On Sunday, April 4, 2006, when Elliott's family tried to visit him, they gave Patrick Graham toiletries, clothes and cash. Patrick Graham never gave the cash or other items to Elliott, nor were these items returned to Elliott when he was picked up by his mother and Sandy on April 8, 2006. Patrick Graham is liable for conversion.

As previously mentioned, Defendant Graham did not file a motion for summary judgment, but merely, joined the other Defendants' motion, adopting the same arguments and authorities. Nowhere do Defendants argue for summary judgment on the claim for conversion against Defendant Graham. As such, it is procedurally barred from doing so now. Further, conversion is an intentional tort not covered by the MTCA.

### CONCLUSION

For all the reasons stated herein, Elliot Guntharp asks that Defendants' Motion for Summary Judgment be denied, except where otherwise conceded.

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.


BY: *s/ Ron Woodruff*
     JIM WAIDE
     MS BAR NO: 6857
     RON L. WOODRUFF
     MS BAR NO. 100391

WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE: 662-842-7324
FACSIMILE: 662-842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Ron L. Woodruff, attorney for Plaintiff, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court, utilizing the ECF system, which sent notification of such filing to the following:

Berkley Huskison, Esq.
bhuskison@mitchellmcnutt.com
fhankins@mitchellmcnutt.com

Christopher James Latimer, Esq.
clatimer@mitchellmcnutt.com
fhankins@mitchellmcnutt.com

Stacy Bo Russell
borussellpllc@hotmail.com
janet_self@hotmail.com

THIS the 7th day of December, 2006.

          *s/ Ron L. Woodruff*
          RON L. WOODRUFF